UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SYLVIA TOPP,

                              Plaintiff,

            v.

HARRY PINCUS and MONICA PINCUS,

                              Defendants.

Index No. 1:20-cv-10016

**COMPLAINT**

---

Plaintiff Sylvia Topp, by and through her attorney, Noah Kupferberg, Esq., alleges as follows:

## INTRODUCTION

1.  Plaintiff Sylvia Topp[1] ("Sylvia" or "Topp" or "Plaintiff") seeks: (i) Partition, pursuant to Article 9 of the New York Real Property Actions and Proceedings Law ("RPAPL"), of a coop apartment taking up the entirety of the 5th Floor (the "5th Floor Coop Apartment") of the building located at 160 Sixth Avenue,[2] New York, NY 10013—in which 5th Floor Coop Apartment she is seized, holding, and possessed in fee as owner of an undivided fifty percent interest as tenant in common—through a sale of the property and division of the proceeds between Topp and the other tenant in common, Defendant Harry Pincus ("Defendant" or "Pincus" or "Defendant Pincus") according to their respective interests; and (ii) An Accounting for the 5th Floor Coop Apartment.

---

[1] Sylvia Topp is also known as Sylvia Kupferberg.
[2] This building also maintains the alternate addresses of 210 Spring Street and 208-210 Spring Street, New York, NY 10012. The building is designated as Block 490, Lot 21 in Manhattan, New York County, New York.

## JURISDICTIONAL STATEMENT

2.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332. The amount in controversy exceeds the value of $75,000, exclusive of interest and costs, and is between Pincus, a citizen of New York, and Topp, a citizen of the foreign state of Canada who is neither lawfully admitted for permanent residence in the United States nor domiciled in New York.

3.   Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to this claim occurred in, and the property that is the subject of this action is situated in, the Southern District of New York.

4.   Under 28 U.S.C. § 1652, federal courts sitting in diversity jurisdiction apply the substantive law of the forum state. Here, the forum state is New York, so New York substantive law applies in this action.

## THE PARTIES

5.   Plaintiff Sylvia Topp was born in Ottawa, Canada, in 1935. Topp is a Canadian citizen, and an individual residing in Canada. Topp lived and worked in the United States and held a U.S. Green Card from 1957 to 2019, but she has never been an American citizen.

6.   Defendant Pincus was born in Brooklyn, New York, in 1952. He is an individual residing in New York, NY. On information and belief, he is an American citizen.

7.   Defendant Monica Pincus ("Monica") is the spouse of Defendant Pincus. She is an individual residing in New York, NY. On information and belief, she is an American citizen. She is named as defendant herein solely as the possible holder of an inchoate right of dower in an undivided share in the 5th Floor Coop Apartment, as required under RPAPL § 903(4).

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

**By Law, as Indicated in New York City Department of Buildings Records, the 5th Floor Coop Apartment Is a Single Unit, Owned by Topp and Pincus as Tenants in Common**

8.   In the autumn of 1974, Sylvia and her husband Tuli Kupferberg ("Tuli") and their two children, Noah Kupferberg ("Noah"), age 4 (now Sylvia's attorney in this action), and Samara Kupferberg ("Samara"), age 8 months (collectively, "the Kupferbergs"), were living in a small rental apartment in the increasingly dangerous Alphabet City neighborhood of Manhattan.

9.   In or about the autumn of 1974, Sylvia discovered that the commercial loft building at 160 Sixth Avenue (the "Building") was for sale, and began looking for other families to form a cooperative, which would share the cost of purchasing the Building.

10. On June 10, 1975, the members of the group Sylvia had brought together signed an incorporation agreement (the "Incorporation Agreement") for the cooperative, which they named Tashikan Corporation (the "Coop," or "Tashikan").

11. Despite discovering the Building and organizing the purchasing group, Sylvia could not afford to purchase a whole floor in the Building, and eventually agreed to share the 5th floor of the Building (the "5th Floor") with Defendant Pincus, then a friend. The Coop's attorney and architect approved of the sharing of the 5th Floor.

12. The Incorporation Agreement states in a chart on page 2, following ¶ 2, that, within 15 days of signing, the purchasers of the 3rd, 4th, and 6th floors were to provide the Coop with a capital contribution of $8160 and a loan of $2000, and in exchange each would receive 2 shares of common stock in the Coop. In the final column, titled "Portion of the Building to [be let] Under a Proprietary Lease," the Portion listed for these purchasers is "3rd floor," "4th floor," and "6th floor," respectively. (The 2nd floor was not sold until five months later, on November 5, 1975.)

13. By contrast, the Incorporation Agreement spells out in the same chart on page 2, following ¶ 2, that, within 15 days of signing, Topp and Pincus were each to provide the Coop with a capital contribution of $4080 and a loan of $1000—exactly one-half of the full-floor contribution figures—and in exchange each would receive 1 share of common stock in the Coop. In the final column, titled "Portion of the Building to [be let] Under a Proprietary Lease," the Portion of the Building listed for both Topp and Pincus is "Joint occupancy of 5th floor."

14. The Incorporation Agreement also, in addressing Coop members Harold and Terrin Levitt's option to purchase the 2nd Floor in whole or in part at a later date, states on page 6, in ¶ 6(a): "If [the Levitts] elect to purchase only one share [of the 2nd Floor] . . . the proprietary lease shall be for the south half of the second floor space, divided in a manner that provides equal value in terms of floor space, access, and utilities." Thus, any contemplated sharing of floors in the Building was always intended to provide each half-floor owner with equal value. The Coop's attorney and architect also approved of this possible sharing of the 2nd Floor.

15. The 1975 Incorporation Agreement was signed by every member of the Coop, including Pincus and Topp.

16. On July 1, 1975, the Coop purchased the Building from the prior owner.

17. On July 1, 1975, the Coop issued a Proprietary Lease to Defendant Pincus (the "1975 Pincus Proprietary Lease"). The 1975 Pincus Proprietary Lease noted that Defendant Pincus was "the owner of one of the common shares" of the Coop and stated that, under this Lease, the Coop leased to Pincus "all that certain space on the 5th floor of the building set forth in the diagram attached hereto as Exhibit A."

18. Exhibit A of the 1975 Pincus Proprietary Lease is a simple outline drawing of the entire 5th Floor. Although it contains a sketched-in rough dividing wall between the North half and the

South half, and a single bathroom on the South half, it makes no indication as to which portion of the 5th Floor was to be assigned to Pincus and which to Topp.

19. Further, the 1975 Pincus Proprietary Lease states in Article I, Section 1, that the Lessor (i.e., the Coop) "shall provide access on each floor to utilities for one kitchen sink, one bathroom sink, one bathtub with a shower, one toilet, one refrigerator, and one kitchen range." In other words, the Pincus Proprietary Lease clearly never promised the construction of two independent apartments on the 5th Floor, or any other floor.

20. Defendant Pincus signed the 1975 Pincus Proprietary Lease.

21. On July 1, 1975, the Coop also issued Topp an apparently identical Proprietary Lease, which she also signed (the "1975 Topp Proprietary Lease").

22. The drawing accompanying the 1975 Topp Proprietary Lease is the same simple outline drawing of the entire 5th Floor that accompanied the 1975 Pincus Proprietary Lease, with no indication as to which portion of the 5th Floor was to be assigned to Pincus and which to Topp. Significantly, however, the Topp version of this drawing, unlike the Pincus version, contains no dividing walls at all, leaving open the question of who added the rough dividing walls and hastily sketched single bathroom to the Pincus version, at what time, and for what reason.

23. On or about July 1, 1975, the Coop issued a stock certificate to Defendant Pincus (the "1975 Pincus Stock Certificate"). The 1975 Pincus Stock Certificate states that Defendant Pincus "is the owner of one share of the common stock of Tashikan Corporation."

24. The 1975 Pincus Stock Certificate, like the 1975 Pincus Proprietary Lease, does not indicate which portion of the 5th Floor was to be assigned to Pincus and which to Topp. In fact, it makes no reference to the 5th Floor—or its division—at all. All it indicates is that Pincus is issued "One share."

25. On or about July 1, 1975, the Coop also issued a stock certificate to Sylvia Topp, then known as Sylvia Kupferberg (the "1975 Topp Stock Certificate"). The 1975 Topp Stock Certificate states, "Sylvia Kupferberg is the owner of one share of the common stock of Tashikan Corporation."

26. The 1975 Topp Stock Certificate, like the 1975 Topp Proprietary Lease, does not indicate which portion of the 5th Floor was to be assigned to Pincus and which to Topp. In fact, it makes no reference to the 5th Floor—or its division—at all. All it indicates is that Topp is issued "One share."

27. Sometime between June and December of 1976, relying on the advice of the Coop's counsel and architect, the Coop pre-filed with the New York City Department of Buildings ("DOB") for a revised Certificate of Occupancy ("CO") for the Building. The associated floor plans for the building were filed as ALT 695/76. In December 1976, Pincus received a copy of the 5th Floor plans that had been submitted to the DOB in its CO prefiling, and he retains a copy of those 5th Floor plans to this day.

28. Notably, the 5th Floor plans filed with the DOB as part of the ALT 695/76 prefiling make no reference to either Topp or Pincus, or which half of the floor had been assigned to each. These plans show only one door from the common hallway into the 5th Floor space. On the north half of the floor there is no kitchen and no bathroom, but only a large industrial sink. The south half of the floor contains the kitchenette, including kitchen sink and gas range, and the only two bathrooms. These plans clearly state, on the south half of the floor: "OCCUPANCY 5 PEOPLE"—presumably referring to Sylvia, Tuli, Noah, Samara, and Defendant Pincus. There is no occupancy statement at all on the north half of the floor.

29. On December 9, 1978, the Coop submitted drawings to the DOB in connection with the anticipated upcoming CO filing. The 5th Floor plans submitted to the DOB on December 9, 1978 appear to be identical to the 5th Floor plans submitted to the DOB as part of ALT 695/76 in 1976.

30. On June 12, 1979, relying on the advice of the Coop's counsel and architect, the Coop filed a new CO with the DOB, CO # 79398 (the "June 1979 CO"). Three weeks later, on July 3, 1979, again relying on the advice of the Coop's counsel and architect, the Coop filed a corrected CO with the DOB, CO # 79468 (the "July 1979 CO," the "1979 CO," or the "CO"). Both of these COs state that the 5th Floor, like every other floor in the Building, contains 1 "dwelling or rooming unit." Both COs also state that in total the Building contains "Five (5) Apartments"— namely the 2nd, 3rd, 4th, 5th, and 6th floors. As Topp explained to the Coop's architect in 2015, she does not know why the CO was issued showing only one unit on the 5th Floor, not two. The members of the Coop were not sophisticated, either legally or architecturally, but simply followed the advice of their lawyer and architect. Both COs also state: "NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED." The Coop has not amended the Certificate of Occupancy since, and as a result, the July 1979 CO is still in effect and applicable, and constitutes the governing document describing the legal use of all spaces in the Building.

31. Under the July 1979 CO, which is still in effect, the 5th Floor is a single unit.

32. Thus, although both Topp and Pincus believed that they had each purchased an independent apartment comprising one-half of the 5th Floor, that is not what they received. Rather, under the terms of the 1975 Topp Proprietary Lease, the 1975 Pincus Proprietary Lease, the 1975 Topp Stock Certificate, the 1975 Pincus Stock Certificate, the June 1979 CO, and the

July 1979 CO, Topp and Pincus are each holding and in possession of the single full 5th Floor unit as tenants in common, in which they each have an estate of inheritance.

33. As a result, Topp and Pincus are the two shareholders and proprietary lessees of the 5th Floor Coop Apartment at 160 Sixth Avenue, New York, NY 10013, which property they jointly own as tenants in common.

**The 5th Floor Coop Apartment Has Never Been Legally Partitioned, and Is So Circumstanced That a Partition Thereof Cannot Be Made Without Great Prejudice**

34. In or around 1975, in discussing the division of the 5th Floor, Topp agreed to allow Defendant Pincus to use a portion of the South half of the 5th Floor for his bathroom. This was done in order to give Pincus a window looking out onto 6th Avenue, which he desired, and more importantly to save Pincus all plumbing expenses, since what was to be his bathroom already existed at that time, and would therefore not need to be moved, or reconstructed elsewhere.

35. In or around 1975, following the agreement regarding Defendant Pincus's bathroom, Topp and Pincus erected inner sheetrock walls, with the division giving Pincus some 90 square feet more than Topp, even without including Pincus's bathroom. Topp and Pincus thus each had their own separate bathroom, although these bathrooms were right next to each other, and both were on the South side of the 5th Floor. Pincus's bathroom was accessed by way of a small shared interior sheetrock hallway.

36. The only kitchen on the 5th Floor was in the South half—Topp's half of the floor—as reflected in the July 1979 CO application submitted by the Coop to the DOB. On information and belief, Pincus lived in the North half of the 5th Floor for at least 13 years with only a hotplate for cooking.

37. The South half of the 5th Floor, to be occupied by Topp, therefore contained 1 kitchen, 2 bathrooms (one to be used by Pincus), and 1 elevator entrance. The North half of the 5th Floor,

to be occupied by Pincus, contained no kitchen, no bathroom, and no elevator entrance. The only significant features in the North half of the 5th Floor were a large industrial sink and the entrance to the Building's fire escape.

38. Under this rough, informal, and unfiled-for division, there also remained a single shared door opening onto the common stairwell that is used by all the tenants in the Building, which leads to the street and roof.

39. Further, Topp and Pincus explicitly agreed, before moving in, to keep all the inner doors unlocked. This agreement gave Pincus access to the elevator entrance on the South end of the 5th Floor, and the Kupferbergs access to the fire escape on the North end of the 5th Floor. In the words of an original Coop member, Topp and Pincus "shared the loft by keeping a common vestibule with doors unlocked to allow access to the fire escape. No part of the space was carved out of the other part. There was no primary part, nor secondary part."

40. When the inner doors were later locked—at Pincus's insistence—each party maintained for some years a key to the other half and the uncontested right to enter, Pincus for the elevator and the Kupferbergs for the fire escape.

41. In or around 1975, the Coop installed all new copper hot- and cold-water risers for the entire Building. These new risers and their associated shutoff valves were constructed in, and remain in, the South portion of each floor, including the 5th Floor.

42. In or around 1975, the Coop also installed new gas lines for the entire Building. These new gas lines were constructed next to the new hot- and cold-water risers, in the South portion of each floor, including the 5th Floor, where they remain today.

43. Further, the waste stacks for the entire Building were situated on the South portion of each floor, including the 5th Floor, where they remain today.

44. By contrast, the electrical meters and breakers for the entire Building, including the 5th Floor, were situated on the North side.

45. In sum, a large number of physical elements of the 5th Floor layout or configuration demonstrate that the 5th Floor was never split into two independent apartments, *e.g.*:

    a. For approximately 8 years, as Pincus states, "I live[d] without a lock on my door . . . in order to provide Sylvia's family fire egress through my living space." During this time, the Kupferbergs had free entry to the North half of the 5th Floor to access the fire escape, while Defendant Pincus had free entry to the South half of the 5th Floor to access the elevator.

    b. For approximately 21 years, from 1975 to 1996, there was a single shared door from the 5th Floor onto the common stairwell.

    c. For approximately 21 years, from 1975 to 1996, Pincus lived in the North half of the 5th Floor without a bathroom, his toilet and bathtub being in the South half of the 5th Floor.

    d. For approximately 20 years, from 1975 to 1995, the 5th Floor shared a single electrical box, until Pincus's complaints regarding the sharing of the bill forced Topp to separate the electrical lines and meters. Topp paid in full and at her sole expense for this separation in early 1995, at a cost of $3475, even though the separation benefited both parties equally.

    e. For approximately 45 years—during the entire existence of the Coop, and down to the present day—the 5th Floor shares a single water supply, with all risers and the main shutoff valve in the South half of the 5th Floor. This remains so despite

the fact that Pincus, refusing to pay anything himself, received $2500 from the Coop in 1995, claiming he would use these funds to separate the plumbing.

46. Defendant Pincus was at all times aware of the common ownership of the 5th Floor. In 1975, when the incoming Tashikan Coop Board (the "Coop Board" or the "Board") expressed concern regarding the wisdom of Topp and Pincus sharing the 5th Floor, Pincus replied— referring to an earlier vacation spent with the Kupferbergs—that, "We shared an island, we can certainly share a floor." Pincus has thus known and understood that he and Topp were to share the 5th Floor since 1975.

47. Starting in the late 1980s, Defendant Pincus began an active and aggressive policy of doing whatever he could to formally split the 5th Floor into two separate apartments.

48. On information and belief, at some point during this period, Pincus added a new gas line leading from the main gas line on the South half of the 5th Floor through the Building's shared stairwell to the North half of the 5th Floor. Gas piping is not permitted in required public exit stairs, corridors, or exit enclosures under the NYC 2014 Fuel Gas Code. Therefore Pincus's new gas line is unlawful.

49. On May 5, 1988, Pincus filed for a permit from the DOB to install an elevator entrance on the north side of the 5th Floor and two new lotline windows in the west wall, facing Sixth Avenue. Notably, in the drawings Defendant submitted to the DOB at that time, there remained no bathroom and no kitchen on the North side of the 5th Floor, but only the same large sink that was present in the 1976 plans filed with the DOB as part of ALT 695/76. Therefore, between 1975 and at least 1988, there was no bathroom and no kitchen on the north side of the 5th Floor.

50. In 1994, in preparation for a contemplated Condominium conversion, the Coop Board commissioned drawings of each floor of the Building. The new 1994 drawings now showed, on

the previously bare and empty North side of the 5th Floor: (1) a new kitchen with a range; and (2) a new bedroom, which included one of the two new windows in the West wall, overlooking Sixth Avenue. Therefore, sometime between 1988 and 1994, Pincus installed a new kitchen with a range and a new bedroom on the North side of the 5th Floor.

51. An architect's 2018 search of all DOB filings from the 1979 CO through 1996 revealed "no changes which add or relocate a Kitchenette or Kitchen or alter the status of the single Living Unit for the entire floor." Therefore, on information and belief, Pincus's new kitchen was neither filed for nor approved by the DOB, and is thus illegal. This unfiled-for kitchen vents onto the lotline on 6th Avenue, which is also illegal. Pincus's new bedroom was also neither filed for nor approved by the DOB, and is thus also illegal.

52. Had Pincus filed for these changes, his application would have been rejected, since there was already an existing kitchen in the South half of the 5th Floor, and a single-occupancy unit cannot legally contain two kitchens. Further, the new bedroom, in the NW corner of the 5th Floor, contains two windows: one lot-line window on the west side, and one window on the north side containing an iron door leading to the fire escape. Neither of these windows provides legal light and air, and therefore the new bedroom is also illegal for this additional reason.

53. In sum, sometime between 1988 and 1994, Pincus created two illegal rooms on the North side of the 5th Floor—a kitchen and a bedroom—neither of which he ever filed for with the DOB.

54. In 1994, as the Coop contemplated conversion to a Condominium, the Coop seriously considered installing a new fire escape, designed solely for the South half of the 5th Floor. The Coop went so far as to solicit bids for the project, which was supported by the entire Coop Board with the exception of Pincus. When the fire escape project was on the brink of approval, Pincus

announced that he had obtained expert information, declaring that no second means of egress was necessary from the South half of the 5th Floor because the stairway was sprinklered. Pincus thus convinced the Coop Board not to go ahead with the new fire escape, since it was unnecessary. From that moment on, Topp, the Kupferbergs, and the Coop Board considered the egress issue for the South half of the 5th Floor resolved, and Sylvia continued her occupancy as before.

55. In 1994, having scuttled the fire escape plan for the South half of the 5th Floor, Defendant Pincus began in earnest his ambitious but ultimately futile attempts to legally split the 5th Floor, which would be required in order to procure the independent apartment on the North half of the 5th Floor that he desired. Pincus began his campaign by promising Sylvia that his plans would create two legal apartments on the 5th Floor. It was on the basis of this promise, and as a gesture of goodwill, that Topp agreed to go along with Pincus's plans.

56. On July 23, 1996, in partial settlement of a 5½-year lawsuit Pincus had brought against the Coop ("the First *Pincus v. Tashikan* lawsuit"), the Coop agreed to allow Pincus to, *inter alia*, construct and install a new bathroom and a second new bedroom on the North side of the 5th Floor. The architectural plans accompanying this settlement, prepared by Pincus's architect and longtime personal friend John Hulme, accurately depicted, in Exhibit "C," Topp's longstanding kitchenette on the South half of the 5th Floor, as well as Pincus's own unfiled-for, illegal kitchen on the North half of the 5th Floor.

57. Nine days later, on August 1, 1996, Defendant Pincus filed an alteration application with the DOB to "INSTALL NEW BATHROOM, PARTITIONS, ENTRANCE DOORS ON 5TH FLOOR.   MECHANICAL VENT FOR BATHROOM." (the "1996 Pincus Alteration Application"). Under this application, in addition to adding a new bathroom on the North half of

13

the 5th Floor, Pincus's plans would rearrange the interior partitions separating the North and South halves of the 5th Floor, and install two separate exits to the public stair, one from the North half and one from the South half, thus completing the physical separation—though, significantly, not the legal separation—of the two halves of the 5th Floor.

58. Under the terms of this new division, although Topp would gain a certain amount of space from the former common hallway and the former Pincus bathroom, Defendant Pincus maintained an area 48 square feet larger than that assigned to Topp.

59. The DOB's publication, *Directive 14 of 1975 Alteration – No Change to Use, Egress or Occupancy*, states: "For alteration applications that do not affect a building Certificate of Occupancy, applicants may follow Directive 14 of 1975, which allows for a more limited plan review. These applicants are authorized to perform final inspection of [their own] work and, when appropriate, request Department sign-off of the job."

60. The 1996 Pincus Alteration Application fraudulently stated that the proposed work was an Alteration Type 2 ("Alt 2"), which is an alteration that does not change use, egress, occupancy, or the certificate of occupancy. As noted above, Under Directive 14 of 1975, work performed under an Alt 2 application may be inspected and self-certified by the same architect who filed the Alt 2 application in the first place.

61. In fact, Pincus's proposed new work on its face implicated at least 4 of the 6 Alteration Type 1 ("Alt 1") factors—the satisfaction of any one of which would necessitate the filing of such work as an Alt 1 application. Namely: (1) Change in Exits/Egress (installing two separate entrances/exits to the public exit stair); (2) Change in Number of Units (changing from 1 unit on the July 1979 CO to 2 units); (3) Change in Room Count (adding a bathroom and a second new bedroom on the north side, thus changing the room count); and (4) Change inconsistent with

current Cert. of Occup. (changing the number of 5th Floor units from 1, as listed on the still-current July 1979 CO, to 2).

62. According to Topp's architect, John Peachy, the 1996 Pincus Alteration Application "continued to ignore the fact that the fifth floor is one unit pursuant to the Certificate of Occupancy and it perpetrated the unfortunate defective Certificate of Occupancy with another false application. The application failed to accurately reflect that the fifth floor consisted of two separate residential units. The application should have been an Alteration Type 1 reflecting a change of occupancy on the Certificate of Occupancy."

63. Further, the drawings submitted to the DOB by Pincus and his architect Hulme in support of the 1996 Pincus Alteration Application failed to include the majority of the South half of the 5th Floor. Even more significantly, these drawings purposely omitted the kitchen range that had existed in Topp's kitchen since at least 1976, while including Pincus's range from his illegal and unfiled-for kitchen, installed sometime between 1988 and 1994.

64. The drawing submitted to the DOB by Pincus and his architect Hulme in support of the 1996 Pincus Alteration Application (the "1996 Pincus Drawing") also omitted numerous other indicators of the presence of a kitchen in the South half of the 5th Floor—of which Pincus was fully aware—including the following notes present in the Coop's 1979 CO drawing (a drawing identical to the one Pincus received from the Coop in December 1976): (1) the words "gas range"; (2) the phrase "12-inch dropped arch" (required by Code to define the area of a Kitchenette); (3) the word "sink"; (4) the term "150 cfm" (exhaust system required by Kitchenette); and (5) the graphic symbol of a square with four circles, indicating a cooking range. Meanwhile, the drawings purposely added, in the North half of the 5th Floor, graphics for countertops, range, and sink, along with the highly misleading note, "Existing Kitchen." This

15

kitchen on the North half may have "existed" in 1996, but it was illegal, since it was neither filed for itself nor included in any previous filing. These changes, submitted directly to the DOB, effectively removed the kitchenette in the South half of the 5th Floor from its prior status on the CO drawings as the 5th Floor's single legal cooking space. By fraudulently removing Topp's kitchen and substituting Pincus's own unfiled-for kitchen, Pincus effectively co-opted for himself exclusively one of the primary required elements of a habitable Dwelling Unit—a kitchen.

65. Thus, although the Pincus/Hulme architectural plans accompanying the July 23, 1996, settlement agreement in the First *Pincus v. Tashikan* lawsuit included Topp's longstanding kitchen range on the South side of the 5th Floor, the drawings Pincus actually submitted to the DOB less than a month later fraudulently omitted the Topp kitchen in its entirety.

66. On information and belief, Pincus and his longtime personal friend and architect John Hulme, whom Pincus has known, in his own words, "since art school days," omitted the South half of the 5th Floor, and omitted the Topp kitchen, while including the illegal Pincus kitchen in their submissions, because they knew that the contemporaneous existence of a kitchen on the South side of the 5th Floor would flag an issue with the 1979 CO—which plainly states that there is only one apartment on the 5th Floor—and thereby cause the DOB to reject Pincus's improper Alt 2 application. As Topp's architect Peachy put it, "The facts are obvious that there are two cooking areas, separate entrances from the stair and elevator, separate bathrooms and a layout that is clearly designed and arranged for two dwelling units when there is only one dwelling unit on the floor in the eyes of the NYC Department of Buildings."

67. On November 13, 1996, Defendant Pincus received a Work Permit from the DOB, which also falsely stated that the proposed work was an Alt 2 application.

68. When the 1996 work was completed, as Pincus himself admitted, "John Hulme self certified his applications." By so doing, Hulme and Pincus once again avoided DOB scrutiny of the purposefully deceptive 1996 Pincus Alteration Application and all the work associated with it, thereby perpetuating the fraudulence of the original application.

69. In sum, the kitchenette and bath in the South half of the 5th Floor, as part of the original 1979 CO approval, were then and remain now the legal ones, which establish the single 5th Floor Dwelling or Rooming Unit shown on the CO. The only way for Pincus to add a kitchen was to eliminate Topp's existing kitchen on the 1996 Pincus Alteration Application—which is exactly what he did. Further, by fraudulently eliminating the existing Topp kitchen and replacing it with the never-filed-for Pincus kitchen in his application, and by entirely closing off the North half of the 5th Floor from the South half and constructing two entirely separate entrances to the common stairwell, Pincus took for himself exclusively every necessary element of a habitable Dwelling Unit. In the words of the Coop's architect, Don Erwin, Pincus's filing "addressed the anticipated changes to the Pincus Apartment but significantly did not explicitly point out the cardinal facts that it was subdividing the fifth floor into two apartments."

70. Further, although this work was filed for and then completed in 1996, it was never inspected by the DOB and never closed out. As a result, this job remained open and dormant for almost 20 years. In 2013, in the course of her own unsuccessful attempt to legally split the North and South halves of the 5th Floor, Topp discovered that the 1996 Pincus Alteration Application was still open. Topp informed Pincus and the Coop Board of this incomplete work, never signed off on by the DOB. On information and belief, Pincus and his architect John Hulme never sought DOB signoff on the 1996 Pincus Alteration Application because they knew that any close examination of their plans by the DOB would reveal that they had falsely and improperly filed

17

their work as an Alt 2 rather than an Alt 1, and that the 5th Floor was therefore illegally split in two, contrary to the CO.

71. On February 17, 2015, Pincus filed a Post-Approval Amendment with the DOB (the "2015 Post-Approval Amendment") to retroactively close out the fraudulent 1996 Pincus Alteration Application. Pincus's new architect, Darius Toraby, again fraudulently stated to the DOB that the work done under the 1996 Pincus Alteration Application was Alt 2, when actually it was Alt 1, implicating as it did: (1) Change in Exits/Egress (two separate entrances from the public stair); (2) Change in Number of Units (from one to two); (3) Change in Room Count (adding two rooms on the North side); and (4) Change inconsistent with CO (creating two separate units where the CO lists one).

72. In the 2015 Post-Approval Amendment to the 1996 Pincus Alteration Application, Toraby explicitly stated that, under Directive 14, "I certify that the construction documents submitted and all construction documents related to this application do not require a new or amended Certificate of Occupancy as there is no change in use, exits, or occupancy." This statement was clearly false, since the 1996 Pincus Alteration Application explicitly sets out to change the exits (adding two separate exit doors where there had been one) and the occupancy (two units where the CO indicated, and continues to indicate, only one for the entire 5th Floor). Thus, by self-certifying the 2015 Post-Approval Amendment, Toraby, like Hulme before him, managed to avoid DOB scrutiny of the fraudulent 1996 Pincus Alteration Application and all the work associated with it.

73. Further, the drawing Toraby prepared to accompany the 2015 Post-Approval Amendment consisted of a reproduction of Hulme's August 6, 1996, drawing accompanying the 1996 Pincus Alteration Application (as acknowledged by Toraby on the drawing itself)—with one significant

difference. The Hulme drawing labeled the North half of the 5th Floor "APT 5 NORTH" and the South half of the 5th Floor "APT. 5 SOUTH." On the Toraby drawing, however, these labels have been whited out, as evidenced by a discolored blank strip at the exact point where they appeared in the 1996 Hulme drawing. On information and belief, Pincus and his architect Toraby purposely omitted these labels from the drawing, just as they omitted the Topp kitchen, for the same reason they fraudulently filed as an Alt 2 instead of an Alt 1—in order to avoid DOB scrutiny that would inevitably have brought to light the fact that there are two separate units on the 5th Floor, while the CO lists only one.

74. On information and belief, Pincus and his architect Toraby fraudulently filed this work as an Alt 2 for the additional reason that, in the words of the Coop's architect, "An Alt 1 application is fraught with potential problems since the DOB could require . . . the Building to demonstrate that all spaces comply with applicable Codes, and any violations cured." As Pincus well knows, the 2nd, 3rd, and 6th Floors of the Building—as well as his own half of the 5th Floor—do not comply with applicable codes, since they all have bedrooms with lotline windows, which therefore do not have legal light and air, and the Building has numerous outstanding violations, and other potential DOB problems to fear from a legitimate Alt 1 application.

75. On May 12, 2015, the DOB issued a Letter of Completion (the "2015 Letter of Completion"), stating: "Because this job was filed as Directive 14 of 1975, the owner retained a registered professional engineer or registered architect, who certified that he/she inspected the work approved on this application and that it complies with the applicable laws, rules and regulations of the Department of Buildings. Based on the nature of the work filed on this application [namely Alt 2 work, which by definition does not implicate a CO change] a new

certificate of occupancy is not required." This closed out—for the moment—the 1996 Pincus Alteration Application.

76. Yet this approval stood on shaky ground. As the Coop's architect later noted after reviewing these submissions, "The documents retroactively filed at the DOB by Pincus misrepresented or concealed relevant information that was critical to fully assess the project. The change of use of the floor and the alteration of the means of egress are both cardinal issues that were required to be revealed. Having failed to do so could subject the architect to professional sanctions at the DOB, and could result in the DOB rescinding its prior approval for the work in the Pincus Apartment until such times [sic] as a means of legalizing the occupancy of the entire fifth floor is devised."

77. In fact, this is exactly what happened. On March 29, 2017, the DOB sent the Coop and Toraby a Notice to Revoke, informing them of the DOB's intention to revoke the 2015 Letter of Completion in connection with the 1996 Pincus Alteration Application, within fifteen days, "unless sufficient information is presented to the Department to demonstrate that the approval and permit should not be revoked."

78. The attached "Notice of Objections — Special Audit" form (the "Notice of Objections") laid out in stark terms most if not all of the fraudulent elements of the 1996 Pincus Alteration Application:

    a. First, the Notice of Objections stated that "A means of egress change shall be filed as a non-directive 14," indicating that Toraby was not permitted to self-certify under Directive 14 any application which—like the 1996 Pincus Alteration Application—changed the means of egress (here by adding two doors to the public exit stair where previously there had been only one);

b.   Second, the Notice of Objections demanded that Toraby and Pincus "Provide proof of existing floor plan layout for the 5th floor," strongly implying that the drawing submitted by Toraby (expressly based on Hulme's 1996 drawing of only one part of the 5th Floor) was insufficient to allow the DOB to properly evaluate the application. In fact, as we know, this drawing almost entirely omitted the South half of the 5th Floor (including the existing kitchen on the South side), the inclusion of which would have raised questions regarding whether the 1996 Pincus Alteration Application was actually an attempt to create a new apartment—which it was;

c.   Third, the Notice of Objections stated that "C/O #79468 [the July 1979 CO, still in effect today] indicates 1 apartment on the 5th floor. Please clarify why there's two separate entries shown on the amended drawing A-102." This question goes to the heart of the fraudulent 1996 Pincus Alteration Application, and indeed what makes it fraudulent. The 1996 Pincus Alteration Application claimed to be an Alt 2, which by definition means no change to the CO. However, as the DOB realized, the replacement of a single door to the public stair with two <u>separate</u> doors to the public stair strongly suggests that the work laid out in the 1996 Pincus Alteration Application would indeed change the CO, and therefore would need to be filed as an Alt 1 application.

79. On information and belief, sometime between March 29, 2017, and July 5, 2017, Pincus and his architect Toraby filed a new Post-Approval Amendment (the "2017 Post-Approval Amendment") with the DOB in another attempt to close out the fraudulent 1996 Pincus Alteration Application.

21

80. In or about this time, according to Pincus, he paid $5000 to "over ride" some unspecified violations, which he attributed to Topp. It is unclear which violations were at issue, or to whom this payment was made.

81. On July 5, 2017, for unexplained reasons, the DOB accepted the 2017 Post-Approval Amendment, noting only that "PAA SUBMITTED FOR THE PURPOSE OF SIGN-OFF, REVISED PW 1B, PLANS BY SUPERSEDING APPLICANT, AI1, TR1 & PW1B ARE SUBMITTED." Pincus and Toraby in this application once again fraudulently characterized the project as an Alt 2.

82. On July 10, 2017, the DOB issued a second Letter of Completion, stating again: "Because this job was filed as Directive 14 of 1975, the owner retained a registered professional engineer or registered architect, who certified that he/she inspected the work approved on this application and that it complies with the applicable laws, rules and regulations of the Department of Buildings." Thus, Toraby self-certified for a second time the 1996 Pincus Alteration Application, even though, as the Notice of Objections clearly stated, "A means of egress change [here, the construction of two doors to the stairwell] shall be filed as a non-directive 14." More importantly, by self-certifying the final inspection and sign-off, Toraby and Pincus once again evaded DOB scrutiny and perpetuated the original fraudulent 1996 Pincus Alteration Application.

83. Upon review of the Pincus/Toraby filings, the Coop's architect Don Erwin concluded, "Pincus filed improper documents at the DOB for subdividing his apartment. The permit application filed by his architect, Darius Toraby, did not reveal the cardinal fact that Pincus was changing the use of the Building by adding an apartment, and was altering the means of egress for the fifth floor. Both of these, had they been disclosed, would have triggered a requirement for

an Alt 1 application in order to change the C of O. . . . The fact that Pincus successfully, but belatedly, was able to obtain a sign-off from the DOB does not shield him from the fact that the documents that the DOB relied upon to assess the work were improper and concealed critical facts."

84. In light of Pincus's numerous fraudulent filings, including (1) the 1996 Pincus Alteration Application; (2) the 2015 Post-Approval Amendment; and (3) the 2017 Post-Approval Amendment, and as reflected on the still-current 1979 CO:

      a.   Topp has the only legal kitchen on the 5th Floor; and

      b.   Topp has the only legal bathroom on the 5th Floor.

85. With no legal kitchen, no legal bathroom, and no independent water, Pincus has done nothing—or at least nothing legal—to split the 5th Floor of the Building into two independent apartments.

86. In conclusion, Pincus himself is responsible for every major change to the 5th Floor layout since the 1979 CO. And although he has tried for many years to split the 5th Floor and thus create a legal apartment for himself, each one of his filings intended to do so has been (a) fraudulent; and (b) self-certified by his architects. On information and belief, this false and serial self-certification of inspections and final sign-offs was necessary in all three cases because Pincus and his architects knew that the DOB would reject all their work if it were ever properly inspected.

87. On information and belief, Pincus has spent between $50,000 and $100,000 on his failed attempts to legally divide the 5th Floor. The entirety of this amount, and the cost of all other improvements made on the North half of the 5th Floor, was expended for Defendant Pincus's

own purposes alone, not for the protection or preservation of the commonly owned 5th Floor Coop Apartment.

88. With the goal of creating a legal apartment in the South half of the 5th Floor, Topp and the Kupferbergs have themselves been working since Tuli's death in 2010 on multiple scenarios to convert the commonly owned 5th Floor into two separate legal apartments. For example:

89. In January 2013, Sylvia hired Barry Mallin as her lawyer.  From January 2013 until May 2014, Mallin attempted to find a legal way to split the North half of the 5th Floor from the South half of the 5th Floor. He was unable to resolve the issues. Sylvia paid Mallin a total of $6,195.00 for his efforts.

90. In March 2013, Sylvia hired Leonard Colchamiro as her architect. From March 2013 until March 2014, Colchamiro searched DOB files and prepared architectural drawings as possible solutions for legally separating the North half of the 5th Floor from the South half of the 5th Floor, but was unable to resolve the numerous problems. Sylvia paid Colchamiro a total of $11,142.79 for these initial efforts.

91. In June 2014, Sylvia hired Howard Zipser, an expert in DOB regulations, as her lawyer. From June 2014 until January 2015, Zipser gave Sylvia advice on applying to the DOB for a change in the CO and represented her at certain agency hearings on this matter. Sylvia paid him a total of $11,557.00 for his work, which was ultimately unsuccessful.

92. In November 2014, Sylvia again hired Leonard Colchamiro as her architect. Between November 2014 and February 2015, Colchamiro worked on a proposal for the DOB and prepared and submitted filings for Sylvia designed to help legally separate the North half of the 5th Floor from the South half of the 5th Floor, but he was again unable to resolve the complex issues. Sylvia paid Colchamiro a total of $2,671.25 for this round of efforts.

24

93. In March 2016, Sylvia hired Robert Litchfield as her architect. On November 7, 2016, Litchfield submitted a Construction Code Determination application ("CCD1") to the DOB, for a predetermination that the triangles along Sixth Avenue—the cause of the *de jure* lack of legal light and air to the South half of all floors in the Building—were too narrow to build upon, and therefore a variance of the Multiple Dwelling Law ("MDL") was called for, permitting the lotline windows in the South half of the floors to be used for legal light and air. The DOB denied this application on March 28, 2017. Through November 1, 2020, Sylvia has paid Litchfield $7500.00 for his unsuccessful efforts to resolve the issues.

94. In July 2015, Sylvia hired David Frazer as her lawyer. From July 2015 to the present, Frazer has attempted to negotiate an agreement with the Coop whereby the Coop would prepare applications and file with the DOB to change the CO so as to create two legal apartments on the 5th Floor. His efforts have not been successful. Through November 1, 2020, Sylvia has paid Frazer $52,399.41 for these unsuccessful efforts to resolve the issue.

95. In November 2015, Sylvia hired John Peachy as her architect. From November 2015 to the present, John Peachy has consulted with Sylvia as to possible strategies for the legal division of the 5th Floor Coop Apartment, without success. Sylvia has thus far paid Peachy $17,170.46 for his unsuccessful efforts.

96. In October 2017, Sylvia hired Sheldon Lobel as her lawyer. From October 2017 until March 2018, he attempted to address the condition of the South half of the 5th Floor, first at the DOB, and then by applying for a variance of the MDL at the Board of Standards and Appeals ("BSA"), both without success. Sylvia paid Lobel $8,330.90 for his unsuccessful efforts.

97. Sylvia has also hired real estate agents in an attempt to obtain a light and air easement herself from the triangle owners. However, these owners are unwilling to sell any such easement,

and will only consider selling the triangle properties at a price of $2.2 million. Topp simply cannot afford this expense—which amounts to the entire estimated value of her half of the 5th Floor. Nor should she be solely responsible for a purchase that would also benefit Pincus (by removing a major obstacle to legally dividing the commonly owned 5th Floor) and the owners of every other floor in the Building (by allowing them to use the 6th Avenue windows for legal light and air for the bedrooms on all the other floors). Yet both Pincus and the Coop refuse to consider paying for, or even contributing to, the purchase of the triangles.

98. In conclusion, Topp and the Kupferbergs have tried diligently for almost eight years— through 4 lawyers, 3 architects, and 2 real estate agents, numerous DOB and BSA filings and rejected applications, several in-person meetings with the DOB, the BSA, and other agencies, and three lawsuits and counting, at a running total cost of $116,966.81—to legally separate the two halves of the 5th Floor, without success, or even any progress.

99. In light of Pincus's and Topp's failures to legally split the floor, the Coop itself has taken independent measures in its own attempt to legally split the 5th Floor.

100.    On information and belief, sometime in 2011 the Coop contacted the owner of the narrow triangle lots to the West of the Building on Sixth Avenue, a Mr. Herzog, to inquire about a light and air easement, which would render the Building's Sixth Avenue lotline windows legal for light and air. Herzog asked for $400,000 for an easement and the Board declined, leaving all bedrooms constructed in the South half of the Building illegal.

101.    On March 3, 2015, the Coop's architect, Don Erwin, concluded as follows with respect to suggested remedies: "The simplest option technically would be to combine the two units on the 5th floor into a single unit so that it complies with the C of O. This relatively straightforward process of 'legalizing' the occupancy has very little likelihood of bringing

collateral damage to un-affected units in the building such as raising the various issues related to artists' work/living spaces, and lack of legal light and air for bedrooms in the rear of the building."

102.     On May 6, 2015, Erwin instead filed submissions with the DOB on behalf of the Coop requesting, *inter alia*: (1) DOB concurrence that the existing code-compliant single exit from the South half of the 5th Floor to the sprinklered common stairwell is adequate for a legal independent apartment; and (2) a variance to permit the use of the West lotline windows along Sixth Avenue for natural light and ventilation for the "proposed rear apartment (#5S)" in the South half of the 5th Floor. This relief was not granted.

103.     Pincus interpreted Erwin's work to mean that the eviction of Topp's subtenants—and the resulting emptying of the South half of the 5th Floor—would in itself resolve the 5th Floor issues and halt the ongoing DOB violations and associated fines (the "Pincus Theory"). On information and belief, the Pincus Theory was designed to effect the subtenants' eviction and thereby place Topp in an unstable financial position so as to force her to sell the South half of the 5th Floor to Pincus at far below market rate. However, Erwin explicitly rejected the Pincus Theory, stating that "the fines are related to the C of O violations, and evicting the tenants does not cure the violation. Technically they are living there 'illegally' but so is everyone else (technically)."

104.     On July 15, 2015, Pincus, through his attorney Martin S. Rapaport, wrote to the Coop Board demanding the eviction of Topp's subtenants, despite having learned just a month earlier from the Coop's architect Don Erwin that "the fines are related to the C of O violations, and evicting the tenants does not cure the violation."

105.     In late 2015, the Coop granted Pincus's request, bringing a holdover proceeding in New York Housing Court against Sylvia demanding her eviction, based on an alleged proprietary lease violation due to an alleged lack of natural light because of several lotline windows in the South half of the 5th Floor. The court found the alleged lack of sufficient light in the South half of the 5th Floor to be "fictional," on the basis of four separate photographs, from different angles, "showing a particularly light and pleasant dwelling space." The court found the underlying Notice to Cure, issued by the Coop to Topp, to be "pretextual," since "the violation exhibited by landlord actually concerns the certificate of occupancy and the subdivision of the floor." The court concluded that "this proceeding is entirely without basis," since Topp "has been leased the unit for residential purposes and has not violated the lease by living in the unit and at times choosing to sublet . . . . Subletting does not violate the certificate of occupancy nor the proprietary lease." The court granted summary judgment to Topp on April 8, 2016.

106.     On information and belief, sometime in December 2017, the Board again contacted Herzog, the owner of the triangle properties, who stated at that time that he would no longer consider selling a light and air easement, but only the triangle properties in full, for which he demanded $2,200,000. Again the Board declined, leaving all bedrooms constructed in the South half of the Building illegal, due to the lotline windows.

107.     On January 26, 2018, perhaps sensing his weakening position, Pincus wrote to the Board, threatening to bring a derivative action if the Board moved against him in any way.

108.     Despite these threats, a few weeks later, in February 2018, the Coop again served a Notice to Cure on Topp, but this time served a Notice to Cure on Pincus as well. Before the Coop could consider whether to bring an action against Topp and Pincus for their failure to cure,

Pincus filed his own action in New York Supreme Court, demanding the removal of the Notice to Cure itself ("the Second *Pincus v. Tashikan* lawsuit").

109.     In response to the Second *Pincus v. Tashikan* lawsuit, the Coop Board asked its architect Don Erwin to weigh in again on the 5th Floor situation. Erwin noted, *inter alia*, that even if all required changes were made on both sides of the 5th Floor, the legal split of the 5th Floor would still require the Coop to file an Alt 1 application with the DOB so as to change the CO to reflect the two legal apartments. Erwin noted that such an application, "even if approved, creates significant hurdles that must be cleared by the Building related to outstanding violations and other open DOB issues that have to be closed out as part of the application."

110.     With respect to the Second *Pincus v. Tashikan* lawsuit, Topp's architect Peachy noted initially, concurring with Erwin's earlier analysis of March 3, 2015, that "as the Certificate of Occupancy is for a single residential unit, both the north and south portions [of the 5th Floor] are equally illegal." As a result, Peachy devised a possible plan for legally splitting the 5th Floor (the "Peachy Plan"), which involved greatly expanding one window in the South half of the 5th Floor and relocating most of the current rooms, including the bathroom and kitchen, and then filing with the DOB.

111.     Although the Coop appears to have considered the Peachy Plan with due seriousness, Pincus from the beginning sought to undermine it, writing to the Board, *inter alia*, "Peachy's Plan will involve approvals from the Landmarks Commission, and DOB inspections which are likely to shed light on other irregularities within our building. I have to assume that if 5S is going to be converted into a legal dwelling, it will require a code compliant second means of egress. Will that stairwell have to run through the south end of everyone's apartment? Are you each prepared to lose a few hundred square feet of space, and endure major construction?" In the

same email, Pincus again denied responsibility for any of the 5th Floor issues, wrongly placed the entire economic burden of the legalization work on Topp, and continued his pattern of threatening ever increasing legal action: "Topp has the right to try to legalize 5S, but only if she is willing to pay for it. Due to certain statements made by Mr. Frazer [Topp's attorney in the Second *Pincus v. Tashikan* lawsuit], I may have to consider new legal action against Ms. Topp. Perhaps her son, the 'freelance attorney' needs work."

112.    Further, and typically, both Pincus and the Coop refused to contribute any money towards putting the Peachy Plan into action. Pincus and the Coop agreed to consider the Peachy Plan, but only if Topp would pay all associated expenses, leaving Topp staring at an estimated $200,000 to $300,000 bill—10% to 15% of the gross value of the property—with no guarantee whatsoever of success. Topp, unable to pay such an amount in any case, was thus constrained to withdraw the proposed settlement under the Peachy Plan.

113.    In sum, as Pincus himself recently calculated, the Coop itself has spent $252,868.36 since 2012 on attorneys, architects, and fines, in its own unsuccessful attempts to split the 5th Floor.

114.    In total then, Topp, Pincus, and the Coop have spent between $400,000 and $500,000 in attempts to legally split the 5th Floor and in penalties for failing to do so, yet they remain exactly where they started. It is now abundantly clear that the 5th Floor simply cannot be legally split without an extraordinary additional outlay of cash, and even then with no guarantee of success. Therefore, the 5th Floor at 160 Sixth Avenue, New York, NY, is a commonly held single piece of real property, so circumstanced that a partition thereof cannot be made without great prejudice to the owners.

115.     Further, in the words of the Coop's architect, Don Erwin, "If no resolution is achieved, the value of the shares held by Pincus and Topp in Tashikan become virtually worthless, since neither space can be legally occupied as separate residences." In other words, the value of the 5th Floor Coop Apartment consists in its status as a single unit under the 1979 CO.

116.     Therefore, no actual physical partition of the 5th Floor Coop Apartment can be made without great prejudice, in the form of either: (1) overwhelming cost, approaching the value of the entire asset—with no guarantee of success; or (2) the relegation of the South half of the 5th Floor to a non-habitable space (as proposed by Pincus), thereby severely damaging the value of the commonly held 5th Floor Coop Apartment—also with no guarantee of success.

**Pincus Is Attempting to Devalue Topp's Property In Order to Purchase It Himself at a Discounted Price**

117.     On July 12, 2010, Tuli died following a long illness. Samara and her husband lived in the South half of the 5th Floor from July 2010 to April 2011, sorting through and categorizing Tuli's possessions to prepare for the sale of his archives to New York University. Afterwards, Noah and his wife and young daughter lived in the South half of the 5th Floor from approximately February 2012 to August 2013, cleaning out the remaining unwanted furniture and belongings and performing some cosmetic renovations.

118.     Sometime in early 2013, Pincus ran into Sylvia at the entrance to the Building. Pincus knew Sylvia was considering subletting her half of the 5th Floor because she was then 77 years old and working only part time, and needed some extra income. Pincus took this opportunity to inform Sylvia that she could live in the South half of the 5th Floor, "but I will never let you sublet." This threat was made despite the fact that subletting is legal under all of the Coop's corporate rules (and some floors had indeed been sublet for decades), and despite the

fact that the Coop's lawyer had already noted, in an email to the Coop Board on August 10, 2012, that "the Lessee [Topp] does not need to obtain the Lessor's [Coop] consent to a residential sublease . . . . Accordingly, if Sylvia insists on subletting, other than requiring her to give the Lessor notice of the sublease and permitting the Lessor to exercise a right of first refusal, there is nothing the Lessor can do to prevent the sublease."

119.    During the approximately 18 months that Noah and his family lived in the South half of the 5th Floor, the Coop Board continued to discuss the proposed sublet and expressed concern regarding the longstanding unresolved matter of the *de facto* division of the 5th Floor into two apartments—a division which, then as now, contradicts the *de jure* single 5th Floor apartment listed on the CO on file with the DOB.

120.    In attempting to brainstorm possible solutions, Noah requested that the Coop architect be asked to weigh in. The Coop had recently, on Pincus's recommendation, hired John Hulme as its architect. It may be recalled that Hulme was Pincus's close personal friend and the architect who filed the original—and, unbeknownst to the Kupferbergs at the time, fraudulent— 1996 Pincus Alteration Application. Pincus objected on several occasions to Noah's request to have Hulme weigh in, stating that he was not retained for such purposes.

121.    Despite his multiple stated objections to Noah's suggestion, Pincus apparently had second thoughts. Now oblivious to cost to the Coop, and without himself seeking Board authorization, Defendant Pincus went directly to his friend Hulme and solicited a letter to the Board on the issue. On August 2, 2012, Hulme wrote to the Coop Board (the "Hulme Letter"). The Hulme Letter set out in stark terms the difficulties involved in altering the CO so as to reflect two apartments on the 5th Floor instead of one. The Hulme Letter stated, *inter alia*, that applying to the DOB to change the CO "would only alert the Department of Buildings of [sic]

your existing situation, with unknown consequences. You have many complex and costly issues already at hand, which must be remedied before even considering the undertaking of a project as daunting as this. Furthermore, obtaining an easement for the property parcels, legal fees, construction of a fire escape, and various structural changes would incur enormous expenses which cannot even be estimated at this time, and probably far exceed anything that you could possibly afford, as I understand it." The letter concluded, "In my opinion, the 5th floor south apartment should be sold to another owner in the building, if it is not retained and inhabited by the original owner, or left vacant."

122.     The Hulme Letter thus declared that changing the CO was a virtual impossibility, and suggested that there were only three possible solutions to the 5th Floor issue: FIRST, that Sylvia herself inhabit the South half of the 5th Floor (which she no longer wished to do); SECOND, that the South half of the 5th Floor be left vacant (thereby drastically devaluing Topp's ownership interest by depriving her of any possible sublet income); or THIRD (but listed first), that the South half of the 5th Floor "should be sold to another owner in the building." The only other owner in the building whose purchase of the South half of the 5th Floor would resolve the ongoing CO issue was, and continues to be, Pincus himself since, following such a purchase, Pincus could combine the two halves of the 5th Floor and thus bring it into compliance with the CO. This letter, written by Hulme at the direct request of his friend Pincus, and without the input or signoff of any other Board member, clarified for Topp and the Kupferbergs for the first time that Pincus was interested in acquiring the South half of the 5th Floor—and at a distressed price.

123.     Nor was it only Topp and the Kupferbergs who recognized this strategy on the part of Pincus. Only eight days after Pincus distributed the Hulme Letter to the Coop, one Board member, who has been part of the Coop since the very beginning in 1975, and therefore knows

Pincus well, wrote to inform the Board that, in her opinion, Hulme's "judgment might be clouded by his friendship" with Pincus, and "I don't think Hulme's opinions on the 5 S apartment issue are necessarily impartial." This Board member also recognized Defendant's likely endgame, concluding that Pincus "wants to be in a position to buy the other half of the floor at a price he will name. It does not seem proper to have Hulme involved with any verdict on the legality of that space."

124.    During this time, Noah was overseeing a few minor renovations within the south half of the 5th Floor—none of which required DOB approval—including replacing a toilet and sink in the bathroom (without switching locations) and constructing a small, temporary interior storeroom. Pincus wrote continual angry emails to the Kupferbergs and the Coop Board about this minor work, concluding a June 7, 2012, email with the following all-caps threat: "IF I BECOME AWARE OF WORK GOING ON [SIC] THE BUILDING WHICH HAS NOT BEEN APPROVED BY THE BOARD, I WILL GO TO THE DEPARTMENT OF BUILDINGS AND FILE A COMPLAINT."

125.    In or around September 2014, Pincus apparently decided that the time was right to follow through on this threat, self-reporting the 5th Floor in a complaint to the Department of Buildings. Following an inspection of the 5th Floor, the DOB filed two separate OATH/ECB (Office of Administrative Trials and Hearings/Environmental Control Board) Notice(s) of Violation and Hearing, the first dated September 3, 2014 ("Violation No. 35101853M" or "1853M") and the second dated September 4, 2014 ("Violation No. 35101854Y" or "1854Y").

126.    Violation 1853M found the following violating conditions on the 5th Floor: "Work without a permit. Work noted: At Fifth Floor partitioned Floor creating two Class 'A' apt. Installed water and waste pipe for three piece bathroom (toilet, sink etc.) residential [illegible]

and washer. Installed gas line for stove at kitchen." Pincus no doubt hoped and expected the violations so issued to implicate the South half of the 5th Floor only, but in this he miscalculated. In fact, Pincus was single-handedly responsible for most if not all of the issues listed in Violation 1853M. For example, it was the fraudulent 1996 Pincus Alteration Application that "partitioned Floor creating two Class 'A' apt." It was Pincus who, under the same fraudulent 1996 Pincus Alteration Application, "Installed water and waste pipe for three piece bathroom (toilet, sink etc.) residential [illegible] and washer." And it was Pincus who "Installed gas line for stove at kitchen" at some point between 1988 and 1994—kitchen work for which he never filed with the DOB. Topp, by contrast, has kept both her bathroom and her kitchen in precisely the same place since moving into the Building in 1975 (with the exception of relocating her kitchen range and sink in 1996), and both her bathroom and her kitchen are clearly displayed on the drawings submitted by the Coop in support of the 1979 CO application, which was accepted by the DOB and remains the operative CO for the building. Therefore, the violating conditions associated with Violation 1853M are unlikely to be the result of the very minimal renovations Topp has performed in the South half of the 5th Floor over the past 45 years. The remedy set out by the DOB for the violating conditions under Violation 1853M was: "Obtain permit or restore to prior legal condition"—meaning restoring the 5th Floor to its physical configuration as shown in the 1979 CO filings, before the changes made under the fraudulent 1996 Pincus Alteration Application.

127.     Violation 1854Y found the following violating conditions on the 5th Floor: "Occupancy contrary to the DOB records. CO # 79468 [the July 1979 CO, still in place today] indicates Fifth floor to be use [sic] as one residential dwelling unit (one class 'A' apt.). Illegal occupancy noted: Floor illegally divided into two class 'A' apt. Each apt. has kitchen (stove,

fridge, sink etc.), bathroom (toilet, sink, shower), sleeping area (bedroom), living room area etc."
The DOB thus has explicitly recognized that: (1) the 5th Floor was "illegally divided" by the
work done under the 1996 Pincus Alteration Application; and (2) Pincus's bathroom (installed
under the 1996 Pincus Alteration Application) and Pincus's kitchen (installed between 1988 and
1994 without filing with the DOB) are also, in and of themselves, illegal, since it was Pincus's
kitchen and bathroom that were added on contrary to the July 1979 CO, while Topp's kitchen
and bathroom were the ones depicted in the DOB-accepted drawings presented in support of the
1979 CO. The remedy set out by the DOB for the violating conditions under Violation 1854Y
was: "Discontinue illegal use," meaning reverting to the legal use specified in the CO: a single
apartment on the 5th Floor.

128.    On information and belief, Pincus reported the 5th Floor to the DOB in an ill-
conceived attempt to devalue Topp's property sufficiently to allow him to buy it at a greatly
reduced price. In the words of the Coop's architect, Don Erwin, "Pincus' . . . filing of the
complaints with the DOB against Topp for non-compliant conditions that are directly the result
of his DOB filing, is disingenuous at best."

129.    Over the past six years, perhaps to obscure his grossly misguided error in
reporting his own violations to the DOB, Pincus has sent hundreds, if not thousands, of at times
overtly desperate emails to Topp and other Coop Board members and the Coop's attorney,
falsely (and somewhat incoherently) arguing that all the issues listed in Violations 1853M and
1854Y are Topp's sole responsibility, claiming *inter alia* that Topp herself had recently installed
a new bathroom, which is false. He has threatened lawsuits multiple times should the Coop
attempt to place any responsibility for these violations on his own fraudulently filed-for
construction on the North half of the 5th Floor. Just recently, Pincus threatened "new, and more

aggressive" litigation (despite the fact that he is already in the midst of an ongoing case against the Coop).

130.    From the moment the Coop began receiving fines associated with Pincus's self-reported Violations 1853M and 1854Y, Defendant Pincus has demanded that Topp, alone and at her own expense, resolve the CO problem, in addition to paying all of the resulting fines herself—despite the fact that the fines are the direct result of his own 1996 Pincus Alteration Application. If this were not enough, Pincus has in addition done everything in his power to interfere with Topp's good-faith efforts to find a solution herself—efforts she has pursued at great personal sacrifice and expense.

131.    Pincus's arguments as to why Topp should bear full responsibility for the problems associated with the 5th Floor amount to, "Tough luck, pal." On January 26, 2018, he laid this out clearly, writing to the Board as follows: "Sylvia Topp owns a share of Tashikan stock, which she can hold or sell. The value of her share of stock is attached to an area of our building that does not appear on our CO as an independent apartment, and does not meet the minimum standard for habitability as set forth by the DOB. Therefore, it cannot be occupied, sublet or sold as an independent apartment or studio. Because her share of stock is not attached to a habitable Unit, its value is not commensurate with the other shares of Tashikan stock."

132.    However, no virtue should be associated with Pincus's landing in the North half of the 5th Floor while Topp ended up in the South. In the words of another original Coop member, "Harry liked the North half because of the light, the square shape, and the windows with their rounded shape on the top half. It could have been the other way around, and Harry could have had the South half which he says he also liked as it was like the prow of a ship. I

won't infer any particular motivation on Harry's part for not supporting efforts to legalize the situation. Still, Harry knows that he could have been the one in the South half."

133.    In fact, of course, the continuing fines for "Occupancy contrary to DOB records" that have resulted from Pincus's self-reporting of the 5th Floor to the DOB are at least equally his own responsibility. As the Coop's architect put it, "The violation that was issued Tashikan by the DOB should be viewed as being the obligation of both Pincus and Topp to resolve since it is the entire fifth floor that is illegally occupied, not just the Topp Apartment. The violation was the direct result of the ignorance of applicable regulations, or by the naivete on the part of both parties when they agreed to subdivide the floor into two apartments. And having brought the violation to the DOB's attention, Pincus brough [sic] to light both his and Topp's complicity in the controversy."

134.    On information and belief, Pincus's constant destabilizing railing and harassment against Topp and the Kupferbergs in emails to other Board members and the Coop's attorney— as well as his own disastrous self-reporting to the DOB—are designed to create a scenario in which the only possible purchaser of Topp's 50% share of the 5th Floor is Pincus himself. Defendant clearly hopes to create a situation where he is in complete control of any future sale of Topp's property—in other words, a market of one, in which he can obtain Topp's rightful property at a drastically reduced price. In fact, Pincus has already made multiple such lowball offers.

135.    In or around 2015, Pincus made an unsolicited offer to purchase the South half of the 5th Floor from Topp for $200,000—one-tenth of the $2,000,000 rough appraisal Sylvia has received from her real estate broker.

136.    On February 5, 2017, Pincus wrote to the Coop Board with a second unsolicited offer to purchase the South half of the 5th Floor from Topp for $200,000—ten cents on the dollar. Pincus brazenly asserted that this insultingly low offer "represents the best solution for the Corporation, as well as for Sylvia," and closed his email with the threat that his obviously unacceptable offer "is, most likely, a last resort in terms of avoiding years of litigation." Pincus understood that he was at that time (as he remains today) the only purchaser in the world for whom the South half of the 5th Floor would retain its actual value, writing, "I am the only person who can legally buy it. Any other 'buyer' would trigger litigation, and require the Board to alter the Certificate of Occupancy for the entire building." He concluded, with a typical bald-faced threat to other Coop members, that "Such a 'sale' [meaning to someone other than himself] will trigger enormous legal fees."

137.    When Sylvia refused to consider this completely unacceptable offer, Pincus turned to other means of forcing her out. On January 26, 2018, Pincus wrote to the Coop Board, stating that, "After 43 years, there is clearly no road to legalization for 'Unit 5S' and no excuse for supporting or prolonging its illegal occupancy." On information and belief, with this email and countless others like it, Pincus is attempting to devalue and undermine all legal use of the South half of the 5th Floor in order to force Topp into a sweetheart deal for himself.

138.    For example, Pincus has continually and falsely stated for years that the South half of the 5th Floor must be entirely vacated, and all interior work completely removed, before the violations and fines can be resolved. This is patently false, since the violations—as clearly stated by the DOB—can only be resolved by: (1) restoring the 5th Floor to its physical arrangement as shown in the 1979 CO; or (2) correcting the 1979 CO to reflect the current configuration; the emptying of the South half of the 5th Floor would accomplish neither.

Recently Pincus has stated that he will refuse any settlement of the Second *Pincus v. Tashikan* lawsuit that does not require the eviction of Topp's subletters and an affidavit that the South half of the 5th Floor will remain vacant. Needless to say, there is no legal or logical reason why the South half of the 5th Floor must be vacated while the North half of the 5th Floor continues to be occupied.

139.     Taking to the next level this strategy of extinguishing Topp's ability to use her space for any purpose whatsoever, Pincus recently solicited a proposal from engineer Ron Livian to convert Topp's South half of the 5th Floor to "non-hazardous storage . . . accessory to the residential units" (the "Storage proposal"). Naturally, implementation of the Storage proposal would drastically and unacceptably reduce the value of Topp's property. Nonetheless, Pincus has continually promoted the Storage proposal as the only possible solution, and the only one acceptable to himself (outside of his purchasing Topp's share), writing to the Board that the Storage proposal "presents a fair and viable plan to Remedy the Illegal Occupancy and 'amend the CO,'" and that Livian "has provided a solution, which would allow Ms. Topp to retain ownership of what she has always owned....an uninhabitable unit in our building, and a stock certificate."

140.     Nor is Topp the only one to recognize Pincus's attempts to devalue her property. In the words of the Coop's architect, "What is unsaid [in Livian's proposal] is that the ONLY resident that could use this [proposed] accessory use [of the South half of the 5th Floor] is the other occupant on the fifth floor – Pincus. In other words, Livian is saying that the only person on earth for which the space has ANY value is Pincus. One may speculate that by rendering the space worthless by his transaction with Topp, Pincus is in position to reap the windfall."

141.    On September 19, 2020, Pincus offered for the third time—again unsolicited—to buy the South half of the 5th Floor for $200,000, this time attempting to take advantage of the Covid-19 pandemic by claiming, "this is real money in a collapsing real estate market."

142.    On October 1, 2020, Pincus stated in an email to the Coop Board that the only resolution to the 5th Floor issue that would not involve what he views as the unacceptably risky step of altering the current CO to reflect two apartments on the floor, is "if Topp were willing to sell her uninhabitable unit to me."

143.    On October 15, 2020, Pincus went even further, stating in an email to the Coop Board that, "Manhattan real estate values have plummeted . . . . If I were to purchase 5S, Topp would be relieved of liability, and further litigation, because if Sylvia and Noah continue to break the law and harm my family, I will have no choice but to sue them. . . . I wonder how Noah and Sylvia will defend their unlawful acts in a real litigation, but in fact, I would prefer to save the co op, and give them the money I have earmarked for that purpose, in exchange for their uninhabitable unit."

144.    Pincus has never offered a single viable solution to the 5th Floor dilemma. On information and belief, he does not want to solve the issue, but hopes instead to continue to perpetuate these roadblocks until he utterly undermines Sylvia financially, forcing her to sell to him at pennies on the dollar.

### FIRST CAUSE OF ACTION: FOR PARTITION BY SALE

145.    Plaintiff realleges and incorporates by reference all of the foregoing paragraphs of this Complaint, as if fully set forth herein.

146.    Plaintiff Topp is seized, holding, and possessed in fee as owner of an undivided fifty percent interest as tenant in common of the 5th Floor Coop Apartment in the Building located at 160 Sixth Avenue (with the alternate addresses of 210 Spring Street and 208-210

Spring Street), New York, NY 10013, also known as Block 490, Lot 21 in New York County, New York.

147.     Defendant Pincus is also the owner of an undivided fifty percent interest as tenant in common of the 5th Floor Coop Apartment.

148.     On information and belief, aside from Plaintiff Topp and Defendant Pincus, no other person holds any interest in the 5th Floor Coop Apartment, as owner or otherwise. However, if Defendant Monica Pincus possesses an inchoate right of dower in an undivided share in the 5th Floor Coop Apartment, she is a necessary defendant in this action under RPAPL § 903(4).

149.     On information and belief, there are no outstanding liens on, nor encumbrances against, the 5th Floor Coop Apartment.

150.     No tenant-in-common agreement, partnership agreement, or operating or management agreement exists between Pincus and Topp.

151.     There are no contractual provisions negating Plaintiff Topp's right to partition the 5th Floor Coop Apartment.

152.     Pincus and Topp own no other property together.

153.     All parties to this action are competent and of full age.

154.     On information and belief, the 5th Floor Coop Apartment has an approximate value of Four Million dollars ($4,000,000.00).

155.     The 5th Floor Coop Apartment is so circumstanced that the actual physical partition thereof between the parties entitled thereto, according to their respective rights and interests, cannot be made without great prejudice and material injury to the owners thereof.

156. By reason of the foregoing, Plaintiff Topp is entitled to partition by public sale of the 5th Floor Coop Apartment.

## SECOND CAUSE OF ACTION: FOR AN ACCOUNTING

157. Plaintiff realleges and incorporates by reference all of the foregoing paragraphs of this Complaint.

158. Although a partition action in New York is statutory, it is equitable in nature, and therefore, as New York courts have held, an accounting is a necessary incident thereof.

159. Here, the parties have not contributed unequally to the protection and preservation of the 5th Floor Coop Apartment, and therefore, following Defendant's payment to Plaintiff of his share of the costs and expenses of this action and the subsequent auction sale, as required under RPAPL § 981(1), the remaining sale proceeds should be split 50/50, with half going to Pincus and half to Topp.

160. By reason of the foregoing, Plaintiff is entitled to an accounting.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment against Defendants and grant Plaintiff the following relief:

(A) On the First Cause of Action, pursuant to Article 9 of the New York Real Property Actions and Proceedings Law, for an interlocutory judgment directing the partition by sale of the 5th Floor Coop Apartment and, following Defendant's payment to Plaintiff of his share of the costs and expenses of this action and of the subsequent auction sale, a division and disbursement of the residual proceeds between Plaintiff Topp and Defendant Pincus according to their respective rights and interests;

(B) On the Second Cause of Action, pursuant to Article 9 of the New York Real Property Actions and Proceedings Law, for an accounting between the parties;

(C) That it be adjudged by said sale and the conveyance pursuant thereto, that the Plaintiff and Defendants and all persons claiming through or under them subsequent to the filing of the Notice of Pendency of this action be forever barred of all right, claim, title, lien, equity of redemption, and interest in said property in possession, reversion, remainder, or otherwise.

(D) Such other and further relief as the Court deems just and equitable.

Dated: Chappaqua, New York
      November 30, 2020

Respectfully submitted,

_____
Noah Kupferberg

NOAH KUPFERBERG, ESQ.
734 King Street
Chappaqua, NY 10514
(646) 335-3968
noahkup@gmail.com

*Attorney for Plaintiff Sylvia Topp*